J-S17016-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : IN THE SUPERIOR COURT OF |
| | :              PENNSYLVANIA |
| | : |
| v. | : |
| | : |
| | : |
| LAMAR TRUITT | : |
| | : |
| Appellant | : No. 3133 EDA 2025 |

Appeal from the PCRA Order Entered December 5, 2025
In the Court of Common Pleas of Philadelphia County
Criminal Division at No: CP-51-CR-0005449-2011

BEFORE:   PANELLA, P.J.E., STABILE, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY STABILE, J.:                **FILED JULY 29, 2026**

Appellant, Lamar Truitt, seeks review of an order denying post-conviction relief. In 2012, Appellant was found guilty, following a jury trial, of one count of first-degree murder and related offenses. He was sentenced to a prison term of life, and the judgment of sentence was affirmed on direct appeal. In 2024, Appellant filed the instant petition (his second) under the Post Conviction Relief Act, 42 Pa.C.S.A. §§ 9541-9546 (PCRA), asserting a claim of after-discovered evidence based on a trial witness' recantation. The Court of Common Pleas of Philadelphia County (PCRA court) dismissed the petition after finding that the recantation was not credible, and that exclusion of the witness' testimony at a new trial would not likely result in a different

_____

[*] Retired Senior Judge assigned to the Superior Court.

verdict. Appellant now challenges those grounds for dismissal. Finding no merit in his claims, we affirm.

This Court has previously summarized the underlying case facts as follows:

> On July 21, 2009, Horace Cunningham and Darryl Pray were walking down Bancroft Street in South Philadelphia when they ran into [Appellant] and Nieem Thomas. All four men were competing drug dealers who sold drugs on either the 1400 or 1500 block of Hicks Street. Mr. Pray and Nieem Thomas got into an argument over drug territory, as Mr. Pray had been selling drugs on a street where Nieem Thomas usually sold drugs. As they argued, Nieem Thomas pulled a gun from his waist and shot Mr. Pray multiple times, killing him. Immediately after the murder, Mr. Cunningham called his girlfriend, Shardey Adkinson, and told her about the shooting. Mr. Cunningham also told at least five other people in the neighborhood that he had witnessed Mr. Pray's murder, and that Nieem Thomas had been the shooter.
>
> Nieem Thomas was arrested [, and ultimately convicted,] for the murder of Darryl Pray. On August 3, 2009, while awaiting trial in country prison, Nieem Thomas placed a call to his cousin, Jabar Thomas.
>
> During the phone call, Jabar Thomas stated to Nieem Thomas, "[w]e see the bul, [Mr. Cunningham, a.k.a.] Pop Pop . . . . [h]e get a hammer glance, he'll do the hammer dance." Nieem Thomas then laughed and asked to speak to "Ockie," which is [Appellant's] nickname. [Appellant] then got on the phone with Nieem Thomas and said that he had run into "the bul" and that he had run away from [Appellant]. On August 8, 2009, and August 18, 2009, Nieem Thomas placed phone calls from prison directly to [Appellant]. During the August 18 phone call, [Appellant] told Nieem Thomas that "[m]utherfuckas out there talking." Nieem Thomas asked, "[w]ho?" and [Appellant] responded, "I hear they got a uh . . . they got a uh . . . warrant for the boy that was . . . the bul Pop Pop."
>
> On August 28, 2009, Homicide Detectives interviewed Mr. Cunningham, who told them the details of Mr. Pray's murder,

including that Nieem Thomas was the shooter. In the months following Mr. Pray's murder, [Appellant] repeatedly asked a friend, Nelson Jones, about Mr. Cunningham's whereabouts. [Appellant] told Nelson Jones that he thought that Mr. Cunningham might retaliate against [Appellant] for Mr. Pray's death, and [Appellant] said he did not want to "take that chance."

On October 11, 2009, at 11:58 p.m., Ramer Jones, a friend of Mr. Cunningham, was listening to music in his aunt's apartment at the corner of 16th Street and Morris Street, when his cousin told him that someone was shooting outside. Ramer Jones went to the window and saw Horace Cunningham running north on Chadwick Street. He was being chased by [Appellant], whom Ramer Jones knew, and another man, both of whom were carrying guns. Ramer Jones heard gunshots and a few seconds later he saw [Appellant] and the second man run south down Chadwick Street. They then stopped running and Ramer Jones heard the second man say to [Appellant], "[a]ll right, Cuz, I'm out."

At the same time, Azim McKnight was at the corner of Chadwick Street and Morris Street when he heard the gunshots coming from the 1700 block of Chadwick Street. Mr. McKnight then heard a man scream and began to pray. Mr. McKnight ran towards the sounds, and found Mr. Cunningham, who had been shot multiple times, lying facedown on the corner of 17th Street and Morris Street. Mr. Cunningham was still conscious, and he told Mr. McKnight that he could not move. Mr. McKnight pressed a towel to Mr. Cunningham's wounds and called the police. When the police arrived, Mr. McKnight and the officers loaded Mr. Cunningham into a police car.

Mr. Cunningham was transported to the University of Pennsylvania Hospital, where he was pronounced dead. Mr. Cunningham had been shot four times, once in each the spinal cord, stomach, side, and thigh. Police recovered six fired cartridge casings, all from a .40 caliber handgun, from the scene of the murder.

On December 27, 2009, the police executed a search warrant on [Appellant's] home at 212 South Alden Street in West Philadelphia. From the house, police recovered two semi-automatic handguns, one of which was a loaded .40 caliber Glock. Police also recovered an empty magazine clip, a magazine clip loaded with .45 caliber bullets, a box of . 45 caliber bullets, a

single 9-millimeter bullet, 8.2 grams of crack cocaine, drug paraphernalia, and a cell phone. [Appellant] was arrested for Mr. Cunningham's murder. Homicide Detectives, who gave a statement in which he admitted that all of the items police recovered from the house belonged to him.

The police obtained [Appellant's] cell phone records. Using these records, police were able to determine that on the night of the murder, [Appellant's] cellphone was used first in West Philadelphia, where [Appellant] resided, then in South Philadelphia at the approximate time that the murder took place, then again in West Philadelphia. Police also obtained surveillance video from a convenience store on the corner of 17th Street and Bancroft Street near where the shooting took place. This video showed a light-colored minivan being driven south on Bancroft Street four minutes before the murder took place. The minivan was consistent with the size and shape of a minivan that was registered to [Appellant] and that [Appellant] had been seen driving on numerous occasions.

As [Appellant] was awaiting trial, he was housed at the State Correctional Institute in Camp Hill, Pennsylvania. **In January 2011, [Appellant] told his cellmate, William Gabriel, that he had killed someone because that person witnessed [Appellant's] friend shoot someone. [Appellant] also told Mr. Gabriel that he knew that there was a witness to Mr. Cunningham's murder, and that [Appellant] had people on the outside "trying to get him."**

***Commonwealth v. Truitt***, No. 473 EDA 2013, at 1-4 (Pa. Super. filed February 20, 2014) (unpublished memorandum) (citations omitted and footnotes omitted; emphasis added).

Appellant's jury trial took place on September 28, 2012. He was found guilty of first-degree murder (18 Pa.C.S.A. § 2502(a)); conspiracy to commit murder (18 Pa.C.S.A. §§ 903, 2502); and possessing an instrument of crime (18 Pa.C.S.A. § 907(a)) (PIC). The trial court sentenced him to a mandatory life sentence on the murder count; a prison term of 20 to 40 years on the

conspiracy count; and one to 2 years on the PIC count. The conspiracy and PIC sentences were run consecutive to the life term.

Appellant filed post-sentence motions, which were denied. He then timely appealed, and this Court affirmed the judgment of sentence. *See Truitt*, No. 473 EDA 2013; *see also Commonwealth v. Truitt*, No. 136 EAL (Pa. July 9, 2014) (denying allocatur). Appellant filed his first PCRA petition in 2015, and it was dismissed in 2022. This Court affirmed the dismissal of the petition in 2024, and Appellant did not seek further review. *See Commonwealth v. Truitt*, No. 2073 EDA 2022 (Pa. Super. filed May 14, 2024) (unpublished memorandum).

On December 24, 2024, Appellant, proceeding *pro se*, filed his second PCRA petition. A *pro se* "supplement" to the petition was filed on January 13, 2025, containing the present after-discovered evidence claim. He contended in the latter filing that his former cellmate, William Gabriel, had (to his surprise) sent him a letter in which he claimed to have falsely testified that Appellant confessed to Cunningham's murder. Gabriel's letter to Appellant reads as follows:

> To Whom it may concern[,]
>
> My name is William Gabriel. I testified against [Appellant] in Philadelphia at his preliminary hearing in 2010 as well as his trial in 2012. The information I provided was never a confession from [Appellant]. Certain thing[s] that he told me were accusations and I used that information to try and reduce the sentence I was serving. I would like the opportunity to correct the lies I told the court.

Supplemental PCRA Petition, 1/13/2025, Exhibit A.

PCRA counsel was appointed, and the PCRA court held an evidentiary hearing on September 5, 2025, to address Gabriel's recantation of his earlier testimony at Appellant's trial.[1] At the evidentiary hearing on Appellant's supplemental PCRA claim, Gabriel recounted that he and Appellant had been cellmates in 2011. Soon thereafter, he began writing letters to detectives investigating the murder of Horace Cunningham, stating that he had information about Appellant's involvement. *See* N.T. Hearing, 9/5/2025, at 27-28. Gabriel testified that did so with the intention of receiving a more favorable parole release date. *See id*., at 31.

Although Appellant had discussed some of the facts of his murder case with Gabriel and other prisoners, Gabriel testified at the PCRA hearing that Appellant never admitted guilt. Rather, Gabriel "just took" what he had overheard and "ran with it" in his communications with the Philadelphia police. *Id*., at 33. Gabriel remembered very little of what Appellant told him, what Gabriel overheard in Appellant's discussions with other prisoners, and what Gabriel had fabricated. *See id*., at 113. Gabriel testified vaguely that,

_____

[1] The Commonwealth does not challenge the timeliness of the instant PCRA petition, which we find to be timely filed under the newly-discovered fact exception to the PCRA's jurisdictional time-bar. A petitioner may assert a PCRA claim over a year after a judgment of sentence has become final when "the fact upon which the claim is predicated were unknown to the petitioner and could not have been ascertained through the exercise of due diligence[.]" 42 Pa.C.S.A. § 9545(b)(1)(ii). A petition invoking this exception must be filed within one year from the date that the claim could have been presented. *See* Pa.C.S.A. § 9545(b)(2). Appellant has satisfied the exception in this case.

"[a]nything other than after the fact of what he was charged with, I would say I made up." *Id*.

Following Gabriel's testimony at the PCRA hearing, the Commonwealth argued that the recantation was not credible for several reasons. First, Gabriel had failed to adequately explain why he had not contacted Appellant until December 2024. *See id,*, at 163-64. In Gabriel's account, he had repeatedly attempted to reach Appellant for many years, beginning in 2017 or 2019, but he only learned in 2021 that his letters to him were not being received. *See id*., at 75-76, 163. It was, inexplicably, not until a few years after that point (December 2024) that Gabriel finally sent Appellant the letter of recantation which formed the basis of the present PCRA petition. No proof was offered to establish that the earlier string of letters had actually been sent, much less returned back to Gabriel.

Additionally, the letter that Gabriel finally sent in 2024 did not appear to be written in a manner that would fit its context. *See id*., at 164-66. It was not addressed to Appellant, but rather "To Whom It May Concern," and overall, the letter's formal tone made it read like a court document rather than a genuine and overdue apology. *See id*. The Commonwealth explained:

> [Commonwealth]: He sent so many letters from 2017 to 2021 that were kicked back. Were they all written as . . . to whom this may concern, as if it's a kind of legal document? Oh no. But now that it's time to send a legal document, I'm going send a legal document. It doesn't make sense, Your Honor. If he was telling the truth today, if he actually felt bad that he perjured himself at [Appellant's] trial, he would have done something when he found out those letters were kicked back. He would have written the

2024 correspondence in a way that sounded contrite, not like somebody trying to send a letter that can be used in court.

[PCRA Court]: The fact that he both sent them to the right place and sent it in a format that would be attachable to a PCRA petition leads you to believe that there was some contact with somebody requesting that he do that?

[Commonwealth]: Absolutely.

*Id*., at 165-66.

The PCRA court, at a hearing on December 5, 2025, made the following findings of fact and conclusions of law:

First of all, I find as a fact that Mr. Gabriel was not a credible witness at the September 5, 2025, evidentiary hearing. I am certainly not satisfied that the recantation is true.

Notably, he testified to numerous details about the case that he must have learned from [Appellant]. And I find to be incredible Mr. Gabriel's claim at the hearing that [Appellant] relayed all of these details solely as allegations and not as facts. Also, at the evidentiary hearing there was substantial gaps in his memory and numerous inconsistencies and admitted falsehoods, and his testimony I find was clearly not worthy of belief.

Second, I'm going to find that his recantation, even if true, would not entitle [Appellant] to PCRA relief. And this conclusion I premise upon the substantial evidence of [Appellant's] guilt that was [adduced] at trial, independent of the testimony of Mr. Gabriel.

This evidence I outlined in my Opinion regarding [Appellant's] direct appeal, so I'm not going to repeat it here. I'll incorporate it by reference. It appears in my Opinion dated April 29, 2013, at Pages 8 to 9. Again, that's my Opinion regarding the direct appeal.

And, therefore, I conclude that even a truthful recantation from Gabriel would not likely compel a different verdict in this case. And for all of these reasons, I find [Appellant's] claim premised upon the recantation of Mr. Gabriel to be without merit

N.T. Hearing, 12/5/2025, at 4-6.

Based on these factual and legal findings, the PCRA court dismissed the present PCRA petition, and Appellant timely appealed. *See* PCRA Court 1925(a) Opinion, 12/8/2025, at 6 (adopting its findings of fact and conclusions of law as reasons why the order dismissing Appellant's petition should be affirmed). He now raises two related issues for our consideration:

> 1. Did the PCRA court err by finding William Gabriel's 9/5/25 testimony incredible?
>
> 2. Assuming that Mr. Gabriel's 9/5/25 testimony was credible, did the Court err by concluding that the trial verdict would not have changed had Mr. Gabriel's trial testimony been precluded?

Appellant's Brief, at 8 (suggested answers omitted).

Appellant's first claim is that the PCRA court erred in dismissing his petition because the witness, Gabriel, credibly testified that his prior testimony implicating Appellant was false.

On review of an order denying PCRA relief, this Court is limited to determining whether "the PCRA court's findings . . . are supported by the record and free from legal error." ***Commonwealth v. Duffey***, 889 A.2d 56, 61 (Pa. 2005). The findings of the PCRA court must be "viewed in the light most favorable to the prevailing party." ***Id***.

To establish a substantive claim of after-discovered evidence, a PCRA petitioner must demonstrate that the evidence:

> (1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach

the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted.

*Commonwealth v. Pagan*, 950 A.2d 270, 292 (Pa. 2008); *see also* 42 Pa.C.S.A. § 9543(a)(2)(vi) (same).

Courts have on numerous occasions observed the "limitations inherent in recantation testimony," describing it as "extremely unreliable." *Commonwealth v. Williams*, 732 A.2d 1167, 1180 (Pa. 1999) (citing *Commonwealth v. Floyd*, 484 A.2d 365, 369 (Pa. 1984)). Indeed, "there is no less reliable form of proof, especially where it involves an admission of perjury." *Commonwealth v. Small*, 189 A.3d 961, 977 (Pa. 2018) (quoting *Commonwealth v. Mosteller*, 284 A.2d 786, 788 (Pa. 1971)).

Accordingly, our Supreme Court has "emphasized that, when addressing an after-discovered evidence claim premised on recantation testimony, 'the PCRA court must, in the first instance, assess the credibility and significance of the recantation in light of the evidence as a whole.'" *Small*, 189 A.3d at 977 (quoting *Commonwealth v. D'Amato*, 856 A.2d 806, 825 (Pa. 2004)). "Unless the PCRA court is satisfied that the recantation is true, it should deny a new trial." *Id*. (quoting *Commonwealth v. Henry*, 706 A.2d 313, 321 (Pa. 1997)).

"The PCRA court's credibility determinations, when supported by the record, are binding on this Court." *Commonwealth v. Spotz*, 18 A.3d 244, 259 (Pa. 2011) (citation omitted). "The deference normally due to the findings of the [PCRA] court is accentuated where what is involved is recantation testimony." *Commonwealth v. Loner*, 836 A.2d 125, 141 (Pa. Super. 2003)

(*en banc*) (quoting ***Commonwealth v. Lee***, 385 A.2d 1317, 1320 (Pa. 1978)).

Here, the PCRA court declined to credit Gabriel's testimony for several reasons. ***See*** N.T. Hearing, 12/5/2025, at 4-6. The PCRA court was dubious about Gabriel's insistence that he had only learned factual details about the Cunningham murder by overhearing Appellant discuss them with another inmate as mere "allegations." ***See id***. Gabriel also failed to recall any of the content of his letters to detectives in which he initially identified Appellant and provided other details of the murder. ***See id***.

We find that these grounds for the dismissal of Appellant's petition are supported by the record. Recantation testimony is inherently unreliable. The PCRA court found that Gabriel's recantation was not credible, and there is no legal or factual basis that would lead this Court to question that credibility determination.

Appellant's second claim is that the PCRA court erred in finding that the exclusion of Gabriel's trial testimony would not likely result in a different verdict if a new trial were granted. Again, we find that no relief is due. Even if Gabriel's recantation was credible, the PCRA court did not err in determining that Appellant would more than likely be found guilty of murder based on "the substantial evidence of [Appellant's] guilt that was [adduced] at trial, independent of the testimony of Mr. Gabriel." N.T. Hearing, 12/5/2025, at 6.

As discussed above, the Commonwealth presented unrefuted evidence at Appellant's trial that he was in contact with Nieem Thomas, who was found

guilty of murdering Darryl Pray, a friend of Horace Cunningham. Appellant discussed with Nieem Thomas the possibility that Cunningham would seek revenge for Pray's death. Appellant was also trying to learn the whereabouts of Cunningham, expressing concern to another friend, Nelson Jones, that he did not want to "take that chance" that Cunningham would retaliate. *See* N.T. Trial, 9/24/2012, at 18.

Moments before he was killed, an eye-witness observed Appellant chasing Cunningham on foot. Blocks away, another witness heard the sound of gunshots and found Cunningham laying on the ground, having sustained multiple gunshot wounds. Cartridge cases from a .40 caliber handgun were found at the scene, and the search of Appellant's residence about six weeks later yielded that same type of weapon. It was also confirmed by video surveillance and phone records that Appellant's vehicle and phone were located near where Cunningham had been shot, at the same time as the shooting.

Based on this evidence, we find that the PCRA court did not err in ruling that Appellant failed to prove Gabriel's recantation would likely result in a different verdict if a new trial were granted. Appellant did not refute compelling direct evidence showing that he had the motive and opportunity to kill Cunningham. He was also seen chasing the victim moments before he was shot, holding a handgun. Thus, Appellant's second claim has no merit, and the order dismissing his PCRA petition must be upheld.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/29/2026